is clear out the one case before the people for the second case move up. So please be mindful of that and we'll give you plenty of time to set. So good morning. The first case for argument this morning is 19-2275 Industrial Print Technologies v. Cenveo. Mr. Maloney, whenever you're ready. Thank you, Your Honor. May it please the court. We have appealed the five issues and two relate to the summary judgment rulings of non-infringement of the variable data printing patent to summary judgment rulings relating to the inkjet control patents and then the amount of fees relating to the dismissal of two of the customers. I plan to try to address these in the order that we've briefed. Mr. Maloney, before you get started, this is just a housekeeping thing. And maybe Mr. Reynos has something to say about this too, but everything in the appendix is marked confidential, including the district court's opinion, all the expert witnesses, the deposition. Now, I think to a certain extent, it's not confidential in the briefs, but we're all, I think, having a hard time here. Like what, if anything we can talk about and why all of this stuff should be confidential. Your Honor, these are confidentiality designations by the defendants, not by my clients. We had this issue in the briefing and we actually had an order rejecting the original brief as redacting too much information. And so we met and conferred with the defendant's counsel and the revised corrected brief has a much more narrow number of terms that are redacted based on their confidentiality. Maybe Mr. Reynos has something to say is that, so now we've got briefs, that talk about stuff in a non-confidential way, but the documents in the appendix that correspond to those are still marked confidential. I assume if it's in the brief, it's good to go. But what about stuff like the district court's opinion? I mean, there's nothing in there that we can, are not free to cite, is there? Again, that was that defendant's request that those opinions be filed under seal by the court and the district court accepted that. That was not at our request. Yes, please. So we had some conversations, you know, we didn't know what they were going to do. And they, there was a thing to do. They originally filed without even engaging with us. Okay. I, besides the history, where are we now? Yes. So the history report, which is that we never had to meet and confer with our underlying records because we never had to get in touch. But where we are now to get to that, that explaining is there's very limited confidence information that relates to the fire signal and some of the very specific details. I don't think are references to the site of the case, please. Other than that, I don't know if there's anything else that's under seal. I'm just looking at the opinions of the court. Perhaps you can, write to us and let us know exactly what's confidential with respect to the, the signal, because it's difficult to, to write an opinion if we don't know what's, what's confidential or not. And, and this, this is another example. I mean, we had to deal with this issue a number of times. This is another example of over-marking of confidentiality and it's, it's diminished the process, you know, and here we are wasting more time on this. Let us know what's confidential and what's not. You guys get together and then we'll be free to go ahead and, and, and use our judgment, right? Write the opinion. Understood your honor. I think it's to the fire signal though, the briefs do have limited amounts of that. Okay. Yeah. Okay. Um, we're going to restore, start you back at the 15 minute clock. Can I ask one quick question, Mr. Marloni? I heard you say that all of the confidential information is the defendant's information. So you have no, you personally for your client have no information that you want to designate a confidential. That's correct. We were just attempting to comply with the, their designations and the protective order in the district court and marking these as confidential in the appendix. Okay. Thank you. Okay. So is it too much to, are we okay with just turning the clock back and starting at 15 minutes? Sorry about that. Yes. We're good. We're good to go. All right. May please the court. So we have two issues relating to the variable data printing patents, two summer judgment rulings on the inkjet control patents, and the issue of the amount of fees awarded. I'm going to try to touch on all of these briefly and I'm trying to go in order that we did in our brief subject, of course, to the, to the court's questions. Okay. Well, let me, I mean, I think we're going to have a lot of questions, so let's just get started. Uh, can I talk about the cases for a minute? The case, the sort of pre principal cases that are in play here, which is your side argues lucent. The other side argues fugitive. As far as I could tell from the district court, summary judgment decision or, and your opposition to summary judgment, you had a seaside to lucent for it, but not for any of the principles or arguments you're making before us in this brief, right? Am I right about that? I'm not sure exactly which cases we cited in our brief. I do know that at the summary judgment oral argument, I argued this point directly to the district court that in a case like this, where a machine is capable of infringing and non infringing modes, circumstantial evidence and direct evidence are both relevant. And the circumstantial evidence in this case included all of the things that we've highlighted in our appellate briefs, which are the fact that they're designed to practice these methods. They're supported. There's extensive evidence of instructions, demonstrations, training, all of this other evidence, all of which was, was put forth in the district court in opposition to their summary judgment through our expert. Let me just follow up on that because there's a more recent case, uh, I guess it's Toshiba and it's a 2012, 2012 case. And it's interesting there because the court, I guess, got caught up in the food fight between Lucent and Fujitsu and tried to sort of make sense of how those two apply. And it seems like the court in that case relied very heavily on Fujitsu being disabled by default, which seems to be the case here. So whether or not you're capable of infringing, the court there differentiated between the two and they said, okay, they were, nothing was done by default in Lucent, but here in Fujitsu, but in Fujitsu it was. In our case, isn't there default? Isn't there, uh, where it says capable of infringement, aren't the devices disabled by default? Well, only in, there's only one instance where there's an issue of a default. That is the processing of PDF files. When the PDF files, which are PDF or PDF PC are processed, there's a setting called optimize that has to be set. And the evidence was that that is not turned on by default, but that doesn't avoid infringement. First of all, that's only, that's only two of the file types accused. There are five. Okay. So can you tell me the two, because I've got four of these and I've got all kinds of lists. So the two that are disabled by default, is that the JLYT? No, that is PDF and PDF VT. Okay. When those two file types are processed, if the Indigo is not set for optimized, it won't use the save and reuse bitmap feature, but that's just simply a dropdown menu and the customer can select on or off. The point they made was, well, it's off when it's shipped to the customer, but your honor, our case is not focused on that alone. By any means, our claims cover when we have expert analysis showing when any of these five files, five file types are used for variable data printing. And we limited the PDF to the situation where the optimized feature is turned on, that in any of those five scenarios, the claims are necessarily practiced. I want to turn to Judge Reyna because he had a question, but I have a question about the expert reports and what they say about those files and formats. So I'm interested in your reliance on your circumstantial evidence question. And to me, circumstantial evidence can mean a lot of different things. It's evidence that can point to a mere possibility, which in that case, I think that it'd be difficult to find summary judgment on that. And it can be evidence that points to a probability that something happened. It's more probable than not that it happened. Are you arguing the latter and so does it make a difference that Lucid pertains to a jury verdict, the review with jury verdict versus in this case when we're looking at summary judgment? Our, our, our, our feeling and our view, your honor, is that, uh, the circumstantial evidence has to show that more likely than not, at least one customer, at least one end user use the infringing modes of operation more likely than not. And that is enough to survive summary judgment under Lucent, under Toshiba. Uh, we have amazing amount of evidence to demonstrate not only circumstantial evidence, identifying the direct infringer. Is that more likely than not? I'm sorry, your honor. I didn't hear your question. It's more likely than not evidence. It's more likely than not. Um, in the, in the, in the, in the area of the infringement, are we talking about identification of the direct infringer? Well, yes, it doesn't have to be identification of a specific customer that, that, that performed the method, but there has to be some evidence, either direct or circumstantial, that more likely than not, at least one end user performed these claimed methods. What do you think is your best evidence, uh, for a PDF VT? Well, for the best evidence to show that more likely or not, at least one customer used variable printing. Okay. That one, the evidence was admittedly lighter on. So I understand where your question is coming from. We have one customer who said they most likely used PDF VT. So that would be the only direct evidence we have on an actual instance of using it. But on that specific use, isn't there only infringement if the variable data feature is enabled and was there any evidence that that one person who arguably may have used that, did it in a way that was enabled to infringe? Possibly, perhaps not for that one customer, but again, this is where. So what we've got is possibly one customer who possibly infringed because we don't know whether or not the device was enabled as required for infringement. I don't agree with that character. Respectfully, I don't agree with that characterization. What we have is circumstantial evidence that all five of these processing modes were deliberately designed into the Indigo machines, that HP trained their customers at onsite demos, demos at their Georgia facility through written materials, week-long training sessions. Can I ask you another question about that? How to do all these things and encourage them to use this. These claims are actually quite straightforward in that you just have to designate static and variable areas, and then the machine does the rest. It saves and reuses the static bitmaps. And that's the essence of the claim. So as long as you're doing variable... I wanted to give you a chance to answer that question, but I do have a question for you that relates to it, which is are the underlying documents, I see you've got your expert testimony and might refer to sales information and marketing data, but at least in my appendix, I have not been able to find that the underlying evidence that's quoted by the expert. Is it in the appendix? Was it provided to the district court? Some of that is in the appendix, but there was an overwhelming amount of evidence. And so we cited the expert report, which in turn identifies all the underlying evidence that the expert relied on. And during the oral argument, I asked the district court if she would like the actual underlying evidence. And she said, no, we don't need to do that. Well, one of the early things she said was you've got a hundred, you cite the hundreds of pages of expert reports and that's all you do. Not calling out. But let me ask you, when she starts off, she divides two and two. And the first was that she, she just concludes there was no infringement there. Is that because there were those weren't covered by the instructions and all of the stuff you're citing training and instructions? Was that with respect to all four of these formats or just to two of them? The instructions covered all five of the, of the relevant file types. So we think this was a major error on the district court's part. She required direct evidence in the sense of someone actually observing somebody using PDF BT with the optimized feature turned down or PPMLT. That is not required. That is absolutely not required. The circumstantial evidence that all five of these formats were not only supported, not specifically trained and demonstrated by HP. It's not required under Lucent, correct? That's correct. Okay. This goes back to my question to you. And I like Mr. Reiner's chance to this question too, does it make a difference that Lucent involves the court review in a jury verdict? Whereas this case involves the court review in the judge, a summary judgment decision. I think the standards are very similar. There just has to be some evidence in a summary judgment context to create a genuine issue of material fact that at least one person, one time, practice the method, which I think is very similar in an infringing way. Yes. All of our proofs are directed only to the infringing most. Well, actually, let me ask you about that. Then when you've got the, um, this is the expert deposition and he highlights the respondents and the jury and whatever, look at 47404 if you will, in the appendix. 47404? Because that's where, these are the questions that were, these were the definitions that I think were given in connection with the court. These were the written interrogatories served on about 30 customers, mostly supervised by the court. These were the only questions that the court would allow us to ask. Okay. So looking down at the, but the question, answering the question was predicated on what the definitions are for what we were talking about. Yes. So look at the question, which I think provides it, um, line 22 through 25. It talks about, let's take one at a time. It talks about PPML. Now, if we agree, this is a different issue in the case, but if we were to agree with the district court's claim construction on that, that's irrelevant. That's not infringing anymore because that's out of the case. That's out of the summary judgment, right? We dispute that. Yes, but let's assume that's a separate issue in this case. So let's assume that we agree with the district court's claim construction and that's out. The next reference is, let's skip the PPML-T. J-L-Y-T. That can only infringe, um, it has alternative non-infringing uses, right? Depends what you mean by that, Your Honor. The non-infringing uses are to use J-L-Y-T for non-variable data printing. We didn't accuse that. Our, all of our evidence of actual use... I'm just looking at the questions. These were questions that were answered. So how would somebody answering these questions know, uh, that you didn't limit the PDF-BT, for instance, and say which can only infringe the very data feature is enabled. That's not what this question, which refers to these use of files. I don't know if it's on these two pages, Your Honor, but the same question is defined variable data printing as printing that changes and some that stays the same and the saving and the reusing of the bitmaps. That was part of the definitions. Where is that? I don't know if it's on this page, but it was definitely in the questions that were asked of these. And that's, and you said, you answered this only if you've done it this way, X, Y, and Z. That was the question. So when you start with the premise that the customer understands variable data printing is this, is this the jobs that have variable content that changes and uses the save and bitmap feature. Then the court said, okay, then we're going to define the file types as these five because any of these five, according to the evidence, our experts analysis, any of these five when used for variable data printing, practice the methods. And that's never been, that wasn't the court's challenge to our evidence. The court accepted that on the summary judgment context. And so by saying yes to this question, that is evidence that at least one of these five was used for variable data printing. And 63% of the respondents said yes. They use one of these five for variable data printing on these machines. Where do you think in the record, we're going to see that definition for variable data printing? I can find it. It's going to take me a moment, but I mean, if you want, you can find it while your opposing counsel is arguing, but just, I think it might be helpful. I will. Thank you, Your Honor. But you said one of those. So the answer would have been, we did use one of these five. What if they all meant the PPML and what if hypothetically on that question, we find there was no infringement because of the claim. Well, there's a tremendous amount of additional evidence of using things beyond PPML. There's direct other testimonial, direct depositions of five or six customers. Those are identified in our brief that use J-Lite, PDF, optimized, interrogatory responses, right. Interrogatory response from HP admitting use of PDF. It is in the record, Your Honor. In the appendix? Yes. I thought we had just one. It's cited in our brief. I'll forget your brief for a moment. In the appendix, I recall having one document. You've got the expert stuff, Mr. Gafford, right? Well, that's what I was referring to. Mr. Gafford's portions of his report cite to all of this evidence, which customers said what about which. But we don't have, just to make clear, do we have any of those underlying documents that the expert cited? No, you have the citations that the expert made to those documents and what that evidence established, which was, for example, that this particular customer admitted using J-Lite and PPML, so on and so forth. We have the JOR report evidence, which is a report HP does that shows that majority of their customers use at least three of these file types. We have these deposition of written questions, which show that 63% responded to using at least one of the five file types, possibly more than one. I take it your view is that even though we don't have the underlying documents, we're supposed to interpret, take your expert's description of those documents and do it in your favor? It wasn't just a description. These were record citations to the exact. But we don't have the record citations. And from what I understand you're saying, the district court judge did not either. The district court was proper to that evidence, but said that expert reports alone was, which she didn't want the underlying citations to the documents that the expert had relied on. And, you know, we could have submitted that. I requested to submit that in the district court at the oral argument. And the court said no. And that wasn't the basis for the court finding summary judgment. The court basically just didn't apply lucent. And Toshiba and acknowledge all of the circumstantial evidence that goes in, in addition to this direct evidence of, of direct. And did you make all of that argument in New York? As I said, when I read your opposition to the summary judgment motion, it had a C site to lucent, but not for purposes of parsing circumstantial versus direct evidence. Well, we, we, we cited the evidence. We, we made the point that this was enough direct and circumstantial evidence that circumstantial evidence are the title of our, of our section on this and our brief is that we have adequate direct and circumstantial evidence that these features are actually have been used. And that, that was, that was the title of that section. As I recall in our brief that we may not have cited lucent specifically, but that is the proposition of law that we were relying on. Can I just take a page 45 for 10? I think this is a portion of your damages expert report, which you rely on in your briefing, right? Yes. And where it says the very, at the end of it, the one bullet, the last bullet point says 17 respondents confirmed that they used one or more of the accused file types. But again, that's could be non-infringing uses, right? So that doesn't help us, right? Well, for BDP printing, the question that the respondents were asked to answer again was, well, let me read you what the sentence, all the sentence says is 17 respondents confirmed that they use one or more of the accused file types or use the infringing BDP methods. So that's an or, or both. Mm hmm. So 17 respondents could have just confirmed that they used one of the accused file types, full stop. Is that the way I should read the sentence? I don't really understand the sentence. I don't believe that that's a reference to the fact that you can use these file types for non BDP printing. And some of the customers had indicated that they don't do BDP printing, but for those that do BDP printing, when they do it with any of these five accused file types, that's the, those are the infringing modes. And what Ms. Riley was doing was, was, where does the sentence say that we're looking at page 45 or 10. But she says it, if I may, Your Honor, she says a paragraph 93 that the data shows that the accused BDP, I'm sorry, where are you in the page? Paragraph 93, which is that her conclusion is that 60, that the accused BDP is widely used to make HP's customers with 63% of the respondents confirming that they use an accused method or file type or both. And I'm not sure why she worried about it. Why would it be? This is similar to what Judge Gross was just talking about. It says 63% used an accused method or file type, but we've already established that just because you use the file type doesn't mean that you're necessarily infringed, right? I'm not sure exactly why she worded it that way. At my understanding, I think she meant to say that these accused methods, and it was always discussed throughout the cases, the accused methods are the use of these file types for BDP. And so to say 63% use the accused method or file type or both, it's, yeah, it's an awkward way of saying it, but her whole point and the data shows that 63% said we do variable data printing and we do it with one of these five file types. Did the district court judge prohibit you from submitting some of the underlying documents, including, you know, expressly said you could not provide it? We asked for, I think, 24 questions and they were very logically laid out to get to a more granular level of detail. And the district court only allowed us five. There were strenuous objections from HP that this was too burdensome on the customers. We wanted to know things like how much printing did you do with each file type? That's not my question. I want to make sure you understand my question. Earlier, you said that you didn't submit the underlying documents because the district court judge didn't want them. I'm asking that the district court judge tell you you could not submit the evidence, including the written question depositions and different materials that are cited in paragraph 93, for example. She never said we cannot submit them. We filed our opposition brief at oral argument. I asked if the court would like us to supplement that with the underlying documents that the experts are citing to. And as I recall, she said, no, that's not, I don't want you to do that. Can I just follow up to a few things you said? Your expert, Mr. Gafford agreed in his deposition that variable data printing for JLYT can be done in non-infringing ways. Did he not? No, he did not. I don't believe he did. I think I may be wrong. Look at 28-958. The question, and do you believe that, do you know that JLYT channels are not used in every JLYT EDP job? Do you know that answer? Well, of course not. Yes, he did say that, but his opinion is that the infringing modes either use channels or something else called the JLYT elements. His opinion, so that question was a red herring. It doesn't matter if they use channels or elements. There's two ways within JLYT to define the variable data areas. And we've addressed this in our brief, our appeal brief. He was simply acknowledging that there's two ways to do it. They don't have to use the channels. That is one way, but the elements are another way of defining a variable data area. His opinion was when you use JLYT to practice VDP jobs, there's no way around it. You infringe these claims. I guess it just takes me back to just to finish up to 47-401, which I thought was the definition you were providing in the context of all these questions. And I don't see at least, you said there's more, and I'm not seeing where that does anything beyond covering non-infringing uses and infringing without the variable data feature. We are way beyond our time. Judge Rainer has a further point. So we've been speaking about LUCID quite a bit and you rely heavily on that case. Do you have any other type of authority that we can look at which stands for the proposition that circumstantial evidence can support a finding of direct infringement as to a specific customer? Am I wrong? Here, we had no identification of a specific customer. No, I strongly disagree with that, your honor. We have many specific customers identified. We have, uh, we have Fort Dearborn. We have, um, uh, yes, as a, as a direct infringer, as a direct infringer. We have admissions by HP and their interrogatory answers of certain customers using that. Why is it circumstantial? That, that evidence is direct. That evidence is direct. We, we submitted both direct as well as circumstantial. There are hundreds of customers who use these indigo machines. We couldn't possibly take discovery of all of them. We're only permitted these five questions of 30. What's not the district, both the circumstantial evidence, what's not the district court opinion based on that? The, there was no, the, uh, the direct infringer was identified or the evidence to direct infringement was circumstantial in nature. Well, she, she, she missed, she misinterpreted the evidence and reaching that conclusion. I have it, uh, it, it, it for four or five Oh eight. Uh, we identify bright format, Shawmut, Strada, Quad, Express Docs, Reisling. These are all customers who admitted directly using my district court opinion. Yes. I'm sorry, your honor. She said there was no direct evidence of PDF VT, no direct evidence of PPML T and in that context, she said it was no infringement and that her air there, well she's not recognizing the term direct evidence. She said because the plaintiff provided no evidence, no evidence. Yes. Okay. But the record shows that we provided the circumstantial evidence because that spans all five file types. Then for J light and PDF optimized, I think she acknowledged there was plenty of direct evidence there. That's where she said, well, but that evidence just shows that they could have used optional features and that was wrong as well because for the infringing methodology, which is the variable data printing, those features aren't optional. They have to designate the variable data area, the static data area, and then the machine saves and reuses the bitmaps. Except for J light and the quote from your expert about how it, channels are just one way to introduce variable data, right? Well, channels or elements in his opinion, which we have proffered is that either use of J light channels or use of J light elements to specify the variable data area falls within the claim. So he was just explaining that there's two ways to do it within J light, two infringing ways. They have to be enabled. J light is always enabled. That doesn't have this. And which, which are the ones where have, which are disabled by default? PDF and PDF slash. So what was your so-called, what was your circumstantial evidence for that? Well, both are supported by the machines. They actually engaged another company to develop a specific rib processor to do that. And they've extensively marketed it. There's instructions, there's demonstrations, there's direct customer training in Georgia on site. There's admissions by HP and their interrogatories of customers actually using the optimized feature turned on. There's the, tell us that again. What was the last thing, but there's evidence that customers actually used it. Agents interrogatory answers, admit that customers ran variable data printing jobs with the optimized feature turned on those, those interrogatory responses are at 45, seven 96 through 45, 800 in the appendix. We have evidence that they have demonstrated and trained customers on how to use the optimized feature. There's a week long training course that customers can, can attend and they get specific instruction on how to use the optimized feature. This is the kind of evidence that is very powerful circumstantial evidence. If I could quickly answer Judge Rainier's earlier question about the case law. I do believe the Convol case, which comes after Lucent was a summary judgment case, Your Honor. And in that context, the court again reaffirmed the principle that evidence such as press releases about the accused features, instructing end users, distributing tools that could be used to support the accused features and the expert analysis of how that was enough evidence to avoid summary judgment. We have more than enough. Was Convol a non-presidential opinion? I don't know, Your Honor. I see it's cited in the appendix. So how is it cited as an APPX? Which means it's not presidential, correct? Understood. Is that it? Any other cases? Well, the, the Lucent case, of course, uh, Toshiba supports us, which follows Lucent. There were two modes of writing the data to the DVD and the, uh, French tried to argue that that meant you couldn't, you had to prove it at a, you know, very detailed level. And the court said no instructions and things of that nature were enough evidence to, to, um, to, and that was again, a summary judgment issue that we had precluded summary judgment because it was circumstantial evidence that supported that. In the Toshiba case, didn't the court try to distinguish between, as I started saying 10 minutes ago, between Fujitsu and Lucent by saying that in Fujitsu, it, in this case, we're going with Lucent because it was not disabled by default, whereas in Fujitsu it was. The court made the observation that in Fujitsu, the feature was, was disabled by default. I agree with you, your honor. And in Toshiba, they made the point that theirs is the infringing product there was not disabled by default, which I read it. Tell me if you disagree. I'm sure that's correct. But again, our infringement evidence regarding the features that can be turned off was only directed to when they're turned on. We have admissions of customers using that, the PDF with the optimized feature turned on. That, that is, we also have incredible amount of circumstantial evidence on that one, because that's the whole point of this. I guess I'm having a hard time. Is this all in your brief? I mean, I read your brief a couple of times, but do you have citations to the record where you say you have direct evidence of a customer using it with all of this stuff turned on? We have HP's interrogatory answers at 45, 796 through 4580 that established customers using it with the optimized feature turned on. That's, that's one example. We have a bright format, a deposition of bright format that admitted using the optimized PDF feature. That's at 44, 508. Well, that's the Gafford report. Referring to that, to that evidence. We have a straw poll, which is a customer survey, which is also relevant evidence under the case law that 63% of the respondents indicated that when they do variable data printing, they use the optimized PDF feature. 63%. That was in Ms. Riley's report. That's the POTI BDP workflow straw poll. That's a customer survey. Customer survey evidence is the type of evidence that the case law has acknowledged this is enough to get over this hump at summary judgment of showing that the features were actually used. That's at APPX 45, 493. So we believe we had more than enough, more than enough evidence to get past this relatively low hurdle of avoiding summary judgment for, for, for an issue like this. I know I'm way over. You're way over, but that's our fault more than yours. So we'll restore some rebuttal. Let's hear from Mr. Rogers. Thank you very much. Edward Reines, and may it please the court. Let me just first address Judge Reyna's question about the law under the, under the trilogy of Anderson, Selotex, and Matsushita. This, the legal standard is exactly the same for reviewing a jury verdict under rule 50 versus a rule 56 motion. It's a, what a reasonable juror have a substantial evidentiary basis. The first thing I'd like to point out is that I think when you look at the Lucent case, these cases all have to be decided on their own facts because what's, what you can infer from marketing materials is going to be very different. In this case, the different formats that you could use are at least 20 listed. I think there's a lot more, but TIFF, JIF, JPEG, Adobe, PCS, Postscript. I mean, there's so many of you. So to apply that to the Lucent example in concrete terms, in Lucent it's the date picker, right? It's the calendar that comes down that everybody gets. You've got tens of millions of probably hundreds of millions of people with the date picker. And the issue was would some number of people use the actual date picker to pick their dates for something or not? Here, it's not like you have this fixed format that people are going to use. They can use 20 or more. And then within them, Your Honor, Judge Prost has a very good eye to pick up on the testimony of Gafford regarding channels. In fact, channels are the basis for the theory of infringement of Gafford. And he said, the question to him was, well, would you have to use channels? And he goes, of course not. All these languages have... Well, let me ask you, Mr. Reiser, if we're getting into the evidence, let me ask you, your friend relied fairly heavily on HP's interrogatories. So what do you have to, you want to tell us where they are in the... Yes, that's at 45799. The relevant part is 798, 799. Okay. Give me a second because I've got a lot of stuff to do. Of course. I mean, the amount of discovery that was taken, you'll see from this question, the answer, how thorough it was. I'm sorry. Give me the citation again. Sure. 45799 is really the most relevant page. You could start at 798. Okay. All right. And so you can see the amount of work HP went to go through all of its files, all its troubleshooting files for all these years. And what it said is it is aware of select few customers who may have attempted to use the optimized PDF. That's on 45798. And then what they did was they called and they said they were having a problem using it. And that was only two customers over the course of eight years. So if there's 300, you know, hundreds of customers here using presses for eight years with different jobs coming in every day. And the total was two troubleshooting instances where they said they attempted and couldn't use it. That does not establish an accurate. Doesn't this evidence also say that this feature, you know, that customers don't usually identify to HP what print types they're using and how they're using it, that they consider that confidential. And so it says this feature, the use of this feature is anecdotal secondhand, right? For the troubleshooting. Yeah. I mean, I assume if they're troubleshooting, they have to reveal it, what they're using. So can I ask you something else about your characterization of losing case? There's been lots of different discussion today about how to distinguish that case. Yes. And in your brief, you take the tact that the court held that if circumstantial evidence were the only evidence of performing the claim method, it would have reversed the jury. Yeah. Isn't that in fact wrong? Yeah. I don't, I don't know if it's wrong. I regretted it when I regret it. So. What do you think Lucent actually says? I think Lucent says where you have a feature on something like Outlook that hundreds of millions of people are using it and everyone's getting trained on how to use it, that there's an inference that at least one person used it. And that seems reasonable to me. I don't have a bone to pick. So it's that for the circumstantial evidence, in that case, it was the circumstantial evidence that actually. That's what it said, yes. I think so. Yeah. But why is that different than here? Lucent says, even though the opinion is a little unusual, it says was just barely sufficient, but it was sufficient. And they just say, well, there are only two people, more people used it. And here you do have on these two pages, you're talking about two customers who may have used a feature. And then you said may have and then you have may have attempted. Right. May have attempted. So I don't know. So you're saying that's less than Lucent? Yeah. I think let me just, if I could just explain the record, why I think it's so different from Lucent, just if I could just have a minute or two for that, I really would appreciate it. So first you have 20 different file types that could be used. Then you have different DFEs, which is basically what's the equipment that's running the software. And I would encourage referring to A49683. And this is that there's multiple different DFEs that could even be used. So what was that? 49683. Sorry, there's just quite a bit here. No, you can't. Oh, yes. Okay. This is who? Who's Mr. Maloney? This is Mr. Maloney. And he goes through and he's arguing. And his point is that there's the SmartStream Production ProPrint server. You'll see that in the second full paragraph at line 13 and 14. And then when you go below, you'll see there's the ASCO DFE at 21. And Mr. Maloney says they did a teeny bit of discovery and were able to confirm with some follow-up that it doesn't practice the methods here. So not only do you have 20 different formats, you have different DFEs that can be used and there's no establishment in any of the evidence in the two troubleshooting calls over eight years that those people were using the ASCO or the SmartStream Production ProPrint server. I'm not appreciating the significance of DFE. I saw that in your brief several times you make that point. And I'm not understanding why that makes a difference with respect to the circumstantial evidence presented here. Okay. So the DFE runs the software. It's not the software itself. It's the platform for the software. And all you need to really know is that Mr. Maloney, who's right here at the summary judgment hearing, was able to confirm that the DFE, the ASCO DFE, which they took discovery on, doesn't practice the methods here. I don't see what else you need to know. That's talking about they dropped it from infringement. This is a point we made in our briefs and below that even as the DFE, the only one they're accusing is the SmartStream Production ProPrint server. And Mr. Maloney won't tell you that's the only DFE that can be used. So even when those two customers called in and said, we can't get this optimized PDF feature to work, we don't know whether they were using XObjects, which is the theory of how YPDF infringes, and that's of document. And then we don't know even if they were using the DFE. But really the perspective that I want to give you is not only is there 20 different formats that can be used, that in the testimony that Judge Prost highlighted about J-Lite, it was like, well, would you only use channels? No, of course, in all these standards, there's a gazillion things you can use. They're just languages that you can use fungibly. And Judge Lin lived with this case for years, seven cases that were given to her by the MDL panel, and she understood that there's so much configurability that goes into it that can't be denied. Mr. Reines, just to follow up on, before you leave the DFE issue, are you positing that as an alternative ground for affirmance? Because I'm not seeing where the district court relied on any of that. The district court didn't say they didn't cite the DFE. What the district court said is you've done all this discovery, which is the point that I really want to ultimately get into, of a relatively small universe, especially compared to something like Lucent. And you haven't given me one example of an actual print job, an actual software code run, an actual circumstance with an actual customer where it's happened. Now, Mr. Maloney did state... Doesn't Lucent tell us that you don't have to give that information? I think Lucent has to be contextual. It can't be that in every situation where you say, what if something said you could use one of 10,000 different options and there was only 10 customers, and you encourage people... So what does Lucent say, that the circumstantial evidence can point to a mere possibility, or does it have to point to a probability? All of this is what's a reasonable inference, which requires judgment. And Chief Judge Lynn exercised judgment as to when you could say a verdict would be supported by this. And the point here is, and this is the perspective I want to give, is there's hundreds of customers, not hundreds of millions. So it's a finite universe. They selected five. They don't argue to you that any of the five used it, except for Dearborn, which they dismissed with prejudice. So it can't be the direct infringement. Who's eliminated? They dismissed it. If that was their best example, it's been out of the case. So they picked their best five. They don't allege to you any of their best five customers that they actually sued, that they did party discovery on, depositions, documents, going through their files, that any of them used anything. Zero. So that's your first red flag, okay? But again, we're going back to Lucent. Lucent said it was very weak evidence, but they said circumstantial evidence that one party used it would be enough to support the jury verdict. Understood. So then they sued five companies, non-using, by any account. The only thing that was just cited, it's not in the briefs, was Fort Dearborn. Fort Dearborn was dismissed with prejudice. How could they possibly be reliant on that? Then they wanted to do all this additional third-party discovery because none of the parties were using any of the accused methods in any way that they could show infringement. And they could have done hundreds of the written interrogatories. They chose to do 30. They wrote the questions. The questions that weren't given were rejected because they were improper. What about Lucent does rest a bit on instructions, and your friend here says that there were training and all kinds of instructions about how to use this in an infringing way, yada, yada, yada. Is that correct? It is not correct in the sense that none of those – there's obviously marketing materials about here's 20 different formats you can use. There's no marketing material that says, use J-Lite with channels on the ProPrint DFE or anything remotely resembling that. What about the expert report that kind of takes those quotes and puts them together? Are we supposed to give that expert report, weigh it favorably on summary judgment? I just think it's got to be contextual, what's a reasonable inference. They did so much discovery here. So they had five customers. They zipped out on that. Then out of hundreds, they picked the 30 best. We gave them all our job origin reports, which tells you basically what the customers are running, which we have some information about when they're variable or not. They selected 30, and they've given you essentially nothing out of what came – the directories aren't even in the record, the answers. Then they could have done – They did come up with circumstantial evidence. But they could have done – but within the universe – I don't know what to say other than within the universe of just a few hundred customers where they had – you did so much discovery. You looked at the answer we did. We went through all – This is what I'm getting to, Mr. Reinhart. I mean, where do we draw the line? I think circumstantial evidence can point to a possibility. Anything is possible, though. Circumstantial evidence can also be argued to point to a probability, meaning there's something more – it's more probable than not that something occurred, that that thing occurred. Where do we draw the line? I think it's easy here. There's different DFEs that are used. There's an admission that there's a DFE that doesn't infringe at all, the ASCO DFE, and that we've gone through that. There's no evidence that anyone used the PRO DFE with J-Lite using channels because their own expert said, well, with J-Lite, yeah, there could be all kinds of other things. Of course there are. I don't know. The point being that they had so much – they could have done follow-up oral depositions of any of the customers that they did the 30 written depositions of. They could have done more subpoenas. The fact that they sued five companies that used – Admission doesn't require any of that. Well, that's if you – I gave you an example that goes to an extreme, which is if there's 10 customers and you say there's 1,000 different formats that we support and then you write out how you support each of the 10,000 formats and say all of them can be configured in multiple ways and here's how you do that. No, it would be a horrible inference from that marketing material that anyone used it. So you have to use judgment. It can't be just there's marketing material. Ergo, there's a direct infringement. You have to look at the record in each case. Chief Judge Lin is extremely sophisticated and experienced. They did massive discovery. They didn't even put the written interrogatories into the record. The first site, you said you have direct evidence. What is it? Fort Dearborn. Fort Dearborn, they abandoned the case because they didn't have any evidence of it. So it's like if there's all these dry halls, it's like give me one print job that uses this, one print job, and if they were able to select five companies that they sued that are customers, in Lucent, no customers were sued, party discovery, expensive, that they're having to reimburse us for. Then do 30 written deposition questions. They could have done 100 if they wanted, and they have nothing from that. They have maybe – What about for – I want to just talk about one example that I think is the strongest example, which is PDFVT. Right. And there's a particular company, the name of which I won't mention, that there's a couple different things. There's the expert report describes evidence showing that that one customer probably used PDFVT with variable printing. I think that's at A44508. And there's also interrogatory responses, again, talking about the troubleshooting calls. Same customer at A45799. Why isn't that enough for circumstantial evidence of use? Right. So PDFV, this is the probably – So all this drip net phishing, and we're talking about ExpressDocs. I want to address Your Honor's best case. This is the best – I think this is a good way to do it, is Ed Adcock from ExpressDocs said they used these other things. They probably used PDFVT. That doesn't tell you, as Judge Gross pointed out, whether they used the VeriData feature. PDFVT is a common format. I'm not denying that. Why would I? It's the truth. PDFVT is not – But it only infringes if they're using the VeriData. Which no one uses. I sat through – that's why the suit against O'Neill was considered improper. O'Neill only used PDF – that's it. And they never once turned on this VeriData. They had to drop the case, did it too long, and got charged fees for it. No one uses this feature. In all the years, there's two people that attempted to do it, and they couldn't do it. And we don't know what else. We don't know what DFAs they were using or anything else. So the best example, Judge Stoll and I agree, that's a great pressure test, is what about PDFVT? Someone probably used something, but no mention of VeriData? Is there another best example? I don't know. There's for PPMLs on the same page. It talks about variable data. Okay. None of these are PPMLT. Okay? So PPMLT, there's no example, period. That's the one that Judge Lynn said no one's ever shown anyone ever using it. So none of these are PPMLT. That's out. PPML is non-infringing because variable data area. That's out. Okay? So, I mean, if you go through them, you see PPMLT, there's no one anywhere. You look at their best, greatest hit is 44508, which Judge Stoll, you helpfully pointed out, which is their expert report's characterization of written interrogatory responses that weren't worthy of being submitted to the district court. The responses are from 30 parties that they hand-selected as the most likely, based on all the discovery that they did, to be using it. And this is a probably they used something without even mentioning VariData. PPMLT is mentioned nowhere. It's out. VariData, PPVT, there's no example of someone using that with Optimized, not even in the troubleshooting. Can I just clarify just, and two of the five of these are PPML, and there's another issue in this case that we never got to. So if we were to hypothetically affirm the district court judgment on infringement, those go out anyway. Right. And so let's just go through them the way the judge did. Let's give Judge Lynn, and it's my fault, not anyone else's, Judge Lynn, the courtesy of that. VariData, PDF, VT, it's never been shown with VariData, and I just went through that with Judge Lynn. You won't find it anywhere. You're not going to find an instance of anyone using it that's evidence. Then you get to J-Lite. Your Honor pointed out the channels problem, which is it's optional. Of course people can do it countless ways. And then PDF has the X objects problem and the VariData problem. That's the four examples that they came up with. Now the question is, through marketing materials, let's say you can use 20 different GIF, PDF, Microsoft formats. You can use whatever you want going into these flexible presses, and then you can use different DFEs. You're not limited to this one DFE. There's no reason no one's going to argue that you are. Was it reasonable for the judge to say, bring me one print job because she was in discovery hearing after discovery hearing. Bring me one print job where any of this has been used. Bring me one deposition question. They chose to inform the deposition question. They could have said, did you use J-Lite? Did you use channels? Did you use channels like this? What DFE did you use? They didn't ask that question. That's not our fault, but yet 30 customers had to answer the questions. So the question is with that kind of discovery record, and we're not talking about hundreds of millions of customers with a date picker. Of course people use the date picker. Someone used the date picker somewhere. That's just common sense, and we don't check our common sense on this because it's judgment about what's a reasonable inference. On this record, is there a reasonable inference that someone did all these different things? No, and the judge went through the four of them and explained why. There's no showing anyone used PPMLT. So it's a supported format. Yes, Judge Reyna, I confess. We support PPMLT. We show people if you want to use PPMLT, how can you use it? They drift net thresh in seven different federal cases with fee awards for excess discovery and didn't come up with one instance of saying, here's someone using PPMLT. So that's a red flag. Let me ask you one other question in response to my question to you. You really did a good job with some of the other evidence, but what about the page A45799 and that where it says, HP is aware of a select few customers who may have attempted to use optimized PDF and then mentions that one customer? Right. This is that in the whole history, two customers attempted to use it and called because they couldn't work it. So your point is that from this we shouldn't infer that they were actually using it because they were having trouble and didn't. So we should infer that they did in fact use it. And that the five companies that they chose that they thought were using PDF with this optimized feature, none of them ever used it. How do I know that none of them ever used it? Because they had to drop the cases and then they got sanctioned. Including that company that we mentioned before? Fort Dearborn they didn't get sanctioned on. I'm sorry? Fort Dearborn they dropped, but they weren't sanctioned. You haven't seen in the appendix or in their briefing that they said Fort Dearborn used X. You would have remembered, oh, let me look at the Fort Dearborn case. They didn't make that argument. I mean the arguments they're making now is really Monday morning quarterbacking on what the district court judge, which is she had this record where they got all this discovery and they didn't come forward with even one document showing that channels were used or whatever, that the DFE was used, that would have shown infringement. And it wasn't for lack of opportunity. And the complaint about the limitation on the deposition questions is unfair because they could have contended any and this is what they came up with and a bunch of them were deemed inappropriate and they were. So, I mean, it's just a matter of if you go through the judge's reasoning and like I did for each of these things, it is very reasonable to conclude that there was no use. Can I ask you just to wrap things up a little? Sure. My colleagues have asked and we've asked a lot about the Lucent case. Is it fair to say that your read of Lucent is it didn't set up black letter law principles that you can infer at least one person used it if their instructions, yada, da, that every case is based on the circumstances of that particular case? It has to be because there's too many fact patterns I could spin up in a very short amount of time that would show you how ludicrous that would be if it was just blindly followed. It's contextual. Here there's hundreds of customers which they did focused discovery on. They could have sent those questions out to 300 customers. It's not like there was a gazillion people using it and to come up with nothing after all that for the district court to say, okay, enough. Show me an example of someone actually using it. And on the DFE, we haven't heard any explanation. Okay. All right. Well, thank you so much for taking so much time for our case, Your Honor. Thank you. No, you certainly don't, but we will give you three minutes for your vote. First of all, this issue of the DFE is another red herring. That was a DFE that was disclosed later in discovery. It was never we looked at it. It didn't do what this case is about. We agreed to drop it. That's not the issue at all. The DFEs that were accused are the ones that performed these variable data printing modes using the five file types that we have focused our case on. All of this discussion of optional features, 20 different formats, none of that's really relevant because we honed our case on the five file types that infringe when they're used for variable data printing. Judge Reyna, to your question, I'm quoting Lucent where it says, the standard is what the Federal Circuit found in Lucent was that more likely than not, one person somewhere in the United States had performed the claimed method. I think that's the standard that Lucent gives us, and that was based on circumstantial evidence. What's incredibly unfair is to require a patent owner to have to go take discovery from hundreds of customers when HP put these features in the indigo machines, heavily marketed them, instructed the customers exactly how to do it, demonstrated it hundreds of times, week-long training sessions, hundreds of them showing exactly how to do it, and we do have direct evidence. I won't go through it again. I know I'm really limited in time here. There was direct evidence as well of actual use by actual customers. Mr. Reynas mentioned the JOR reports. What are those? Those are HP's reports that show when someone for personalized printing, i.e., variable data, uses either J-Lite, PPML, or PDF-BT, and the majority of those reports show that the majority of their customers have been designated in these JOR reports as doing just that. That's direct evidence. We have customer surveys. That's also relevant. Customer surveys on what folks do in the industry show that 63% of customers who have been surveyed who do variable data printing do it with optimized PDF, 8% use J-Lite, 32% use PDF-BT. I would say that's direct evidence, but at a minimum, it's circumstantial evidence. The optimized PDF feature that's referred to in 45-508, does that even specify the file type? Optimized has to be thought of as in addition to the file type, so we have PDF and PDF-BT. Those are two slightly— Okay, the user of the optimized PDF feature. That doesn't signify infringement, right? It does, because what we mean by—what I mean, I apologize. What I mean by the optimized PDF is processing PDF files with the optimized feature turned on. Well, that's not what it says. That's what you say you mean, but that's not what the— What were you referring to? I'm on 40—I don't want to take your time. 44-508, where you list the various things, and it just says user of the optimized PDF feature, and I don't know what to think of that. Throughout the entire case, we've referred to the optimized PDF feature as PDF when the optimized feature on the machine is turned on, Your Honor. I wanted to answer the question from earlier about the definition of EDP and the customer written deposition questions, which is Appendix 105-48. This is an earlier version of the questions. You'll notice it has seven questions, but I believe on that page is where the variable data print job is defined. It is question number four, and it defines variable data print job as a print job that has elements of a page that may change between one instance of the page and another. First requirement conducted using one of the five—one of the following file types, and then it lists those five, and it specifically says with the optimized PDF feature. So that was the way we drafted the question that way. The court approved the question that way because everybody understood that gets to the nub of our case. Anyone who does that, who says yes to that question, has used at least one of the five file types to perform what's accused in this case. That is why those customer questions that 63% responded yes to is powerful direct evidence, additional direct evidence of infringement. Okay. Colleagues, anything further? Thank you. Thank you very much.